## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

IRA ALSTON,
    *Plaintiff,*

    v.

ROBERT MARTIN and JESUS
GUADARRAMA,
    *Defendant(s).*

No. 3:22-cv-1495 (VAB)

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Ira Alston has sued Robert Martin and Jesus Guadarrama (collectively, the "Defendants"), wardens with the Connecticut Department of Correction ("DOC"), alleging violations of his First Amendment right to private communications with his Legal Team. Second Am. Compl. ¶ 48.

The Defendants have moved for summary judgment. Defs.'s Mot. for Summ. J., ECF No. 89 (Mar. 7, 2025) ("MSJ").

For the following reasons, the Defendants' motion for summary judgment is **GRANTED.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

Mr. Alston is incarcerated and in the custody of the DOC. Local 56(a)(1) Statement of Facts in Opp'n to Summ. J. ¶ 1, ECF No. 98 ("Pl. SOF"). He is proceeding *pro se* in a habeas petition before the Connecticut Superior Court. Pl. Additional Material Facts ¶ 3, ECF No. 98 ("AMF"). The Connecticut Office of the Chief Public Defender authorized Mr. Alston to hire experts to assist in his habeas case: Valentin Forensics, LLC; Fortified Investigations and Security, LLC; and G & G Firearm Experts, Inc. (collectively, "Legal Team"). *Id.* ¶ 4.

Mr. Martin and Mr. Guadarrama are employees of the DOC. Pl. SOF ¶ 2. Mr. Martin served as warden at Corrigan Correctional Center ("Corrigan") from 2020 to 2023, and then as warden at Osborn Correction Institutional ("Osborn") from November 2023 to present. *Id.* ¶ 3. Mr. Guadarrama has served as a warden since June 2020, and in November 2023, he became warden at MacDougall-Walker Correctional Institution ("MacDougall"). *Id.* ¶ 4. Both Mr. Martin and Mr. Guadarrama also occasionally served as an Acting District Administrator, where they were also responsible for reviewing Level-2 grievances filed within the district. *Id.* ¶ 3–5.

On June 15, 2022, Mr. Alston was transferred from a facility in Virigina to Corrigan in Connecticut. *Id.* ¶ 13. At Corrigan, Mr. Alston was permitted to speak privately with Dr. Peter Valentin of Valentin Forensics but was not permitted to speak privately with his private investigator or firearms expert. *Id.* He alleges that prison staff opened, searched, and discarded his mail from Valentin Forensics, and that they did not allow Dr. Valentin to physically deliver him mail during a visit. AMF ¶ 10, 18, 21. Likewise, his mail from his private investigator and firearms expert allegedly were subject to search outside of his presence. *Id.* ¶ 33. Additionally, he alleges that his calls with his Legal Team were subject to monitoring and recording. *Id.* ¶ 21, 33.

On August 14, 2022, Mr. Alston filed an informal request seeking access to his forensic expert, private investigator, and law library among other things. *Id.* ¶ 8.  Mr. Alston received a response on August 22, 2022, which stated that no law library exists and that he had an appropriate placement. *Id.* ¶ 9. The following day, he filed a Level-1 grievance appealing that decision, *id.* ¶ 12, which was denied on September 22, 2022, *id.* ¶ 13. On September 23, 2022, he appealed the decision by filing a Level-2 grievance, *id.*, which was denied on October 18, 2022, *id.* ¶ 14.

On or around November 4, 2022, Mr. Alston filed another Level-1 grievance requesting that his communication with his Private Investigator and Firearms expert be treated as privileged communication. Pl. SOF ¶ 14. On November 14, 2022, Mr. Martin denied the request until further documentation and/or verification was received showing that the investigative firm was partnering with an attorney on a case. *Id.* On or around December 7, 2022, Mr. Alston appealed the decision by filing a Level-2 grievance and requesting that the reviewing officer contact the Chief Public Defender for verification. *Id.* ¶ 15; Ex. C at 8, Defs.' Mem. of L. in Supp. of Mot. for Summ. J. He did not provide any documentation. Pl. SOF ¶ 15. On December 19, 2022, Mr. Guadarrama denied the request due to lack of verification or documentation. *Id.*

On or around January 13, 2023, Mr. Alston filed another Level-1 grievance requesting that his communication with Dr. Valentin be considered privileged communication. *Id.* ¶ 16. On January 19, 2023, Mr. Martin rejected the request as untimely because it was not filed within thirty days after the occurrence or discovery of the cause of the grievance. *Id.*

On March 13, 2023, Mr. Alston was placed on a grievance restriction for abuse of the system, and he was restricted to filing one grievance per month until September 9, 2023. AMF ¶ 8.

On July 17, 2023, Mr. Alston filed another Level-1 grievance requesting that his communication with Dr. Valentin be considered privileged communication, and attached documentation from the Division of the Public Defender Services. Pl. SOF ¶ 17. On September 6, 2023, another warden upheld the grievance. *Id.*

On November 13, 2023, Mr. Alston was transferred to Osborn. *Id.* ¶ 19.

On or around December 4, 2023, Mr. Alston submitted an informal request to have privileged communication with his Legal Team. *Id.*

On December 4, 2023, the acting warden at Osborn denied Mr. Alston's request pending documentation or verification. *Id.* ¶ 20.

On or around December 18, 2023, Mr. Alston provided documentation to prison staff at Osborn and was allowed private and privileged communication with his legal team. *Id.* ¶ 21.

On February 9, 2024, Mr. Alston was transferred to MacDougall. *Id.* ¶ 22. He has been able to communicate with his Legal Team in a private and privileged manner. *Id.* ¶ 23–24.

Mr. Alston's habeas petition is now on appeal and counsel has been appointed to represent him on the appeal only. *Id.* ¶ 23.

### B. Procedural History

On November 22, 2022, Mr. Alston, *pro se*, filed his Complaint against Mr. Martin. Compl. ECF, No. 1.

On March 13, 2023, the Honorable Vanessa L. Bryant issued an Initial Review Order, dismissing any access to courts claims without prejudice and allowing the case to proceed on the First Amendment claim against Mr. Martin in his individual and official capacities. Order at 8, ECF No. 8. Judge Bryant also invited Mr. Alston to file a motion for appointment of counsel as the case raised "novel" issues." *Id.*

On March 22, 2023, Mr. Alston filed a motion for appointment of pro bono counsel, Mot., ECF No. 12, which Judge Bryant granted on March 30, 2023, Order, ECF No. 13.

On May 15, 2023, Mr. Martin filed his Answer. Def.'s Answer, Aff. Defenses, and Jury Claim, ECF No. 23.

On June 9, 2023, the case was transferred to the Honorable Jeffrey A. Meyer. Order of Transfer, ECF No. 32.

On January 29, 2024, Mr. Alston, through counsel, filed a motion to amend his Complaint. Mot. to Supplement Compl., ECF No. 59.

On February 28, 2024, Mr. Martin filed a motion to dismiss. Mot. to Dismiss, ECF No. 62.

On March 27, 2024, Judge Meyer held a hearing on the motion to dismiss. Calendar Entry, ECF No. 65. He also granted Mr. Alston's motion to amend the Complaint. Order, ECF No. 66.

On April 8, 2024, Mr. Alston filed his Amended Complaint. Am. Compl., ECF No. 67.

On May 1, 2024, Mr. Alston filed another motion to amend his Complaint. Pl.'s Mot. for Leave to Amend Compl., ECF No. 69.

On May 13, 2024, Judge Meyer granted the motion to amend the Complaint and denied as moot Mr. Martin's motion to dismiss. Order, ECF No. 75.

On May 21, 2024, Mr. Alston filed his Second Amended Complaint, the operative Complaint, against the Defendants. Second Am. Compl., ECF No. 76.

On July 22, 2024, the Defendants filed their Answer to the Second Amended Complaint. Defs.' Answer, Aff. Defenses, and Jury Claim in Resp. to Pl.'s Second Am. Compl., ECF No. 83.

On January 17, 2025, following the tragic death of the Honorable Judge Jeffrey A. Meyer, the case was transferred to this Court. Order of Transfer, ECF No. 86.

On March 7, 2025, the Defendants filed a motion for summary judgment and accompanying briefing. MSJ; Defs.' Mem. of L. in Supp. of Mot. for Summ. J., ECF No. 89-1 ("MSJ Mem."); Local 56(a)(1) Statement of Material Facts, ECF No. 89-2 ("Def. SOF").

On June 20, 2025, Mr. Alston filed his opposition memo. Pl. Mem. of L. in Opp'n to Defs.' Mot. for Summ. J. ("Opp'n"), ECF No. 97; Pl. SOF.

On July 3, 2025, the Defendants filed their reply. Defs.' Reply Mem. of L. in Supp. of Their Mot. of Summ. J., ECF No. 100 ("Reply").

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by

documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.    DISCUSSION

The Defendants argue that they are entitled to summary judgment because: (1) Mr. Alston failed to exhaust administrative remedies, (2) his request for injunctive relief is moot, (3)

there was no First Amendment violation as a matter of law, and (4) they are entitled to qualified immunity.[1]

The Court first addresses mootness, *see United States v. Juvenile Male*, 564 U.S. 932, 935 (2011) (describing mootness as a "threshold issue" that "might prevent [the court] from reviewing the decision below on the merits"), then considers exhaustion before addressing the legal merits and qualified immunity defense.

### A. Mootness

"To sustain jurisdiction, a dispute must not only be alive when filed, but throughout its pendency." *Doe v. McDonald*, 128 F.4th 379, 385 (2d Cir. 2025); *see also Juvenile Male*, 564 U.S. at 936 ("It is a basic principle of Article III that a justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed.'" (quoting *Arizonans for Off. English v. Arizona,* 520 U.S. 43, 67 (1997))). "A case is moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome,' making it 'impossible for a court to grant any effectual relief whatever to the prevailing party.'" *McDonald,* 128 F.4th at 385 (quoting first *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013); and then *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (per curiam)). When a case is moot, "a federal court lacks subject matter jurisdiction over the action" and the case "must be dismissed." *New York City Emps.' Ret. Sys. v. Dole Food Co.*, 969 F.2d 1430, 1433 (2d Cir. 1992).

---

[1] The Defendants also argue that they are entitled to summary judgment because Mr. Alston is barred from recovering money damages under 42 U.S.C. § 1997e(e) because he did not suffer physical injury. MSJ Mem. at 14. Section 1997e(e), however, "does not limit the availability of nominal damages for the violation of a constitutional right or of punitive damages." *Thompson v. Carter*, 284 F.3d 411, 418 (2d Cir. 2002). Mr. Alston seeks only punitive and nominal damages, Second Am. Compl. at 9, thus § 1997e(e) is inapplicable notwithstanding the absence of physical injury.

The Defendants argue that Mr. Alston's claims are now moot because he is represented by counsel in his habeas petition and he has received approval to speak with his Legal Team in a privileged manner at MacDougall. MSJ Mem. at 15–16. In their view, it is "entirely speculative" whether Mr. Alston may be unable to speak with his legal team in a privileged manner because even if his habeas petition is granted and the case returns to the lower court, it is uncertain whether his counsel would be removed or if he would be again authorized for expert expenses. *Id.* at 16.

Conversely, Mr. Alston argues that his claims are not moot because he only has counsel for his habeas appeal and remains self-represented in the lower court. Opp'n at 11–12. Additionally, there is no guarantee that he will continue to have privileged access to his Legal Team as the Defendants can revoke access if they wish, and did so previously. *Id.* at 12. Lastly, Mr. Alston's claims cannot be moot because he seeks not only injunctive relief, but also declaratory judgment and damages. *Id.* at 13.

The Court agrees.

Mr. Alston now being represented on his appeal does not moot this case. "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968). Here, however, it is not "absolutely clear" that Mr. Alston now represented by counsel in his habeas appeal cannot reasonably expect to be barred from private communications with his Legal Team. He remains self-represented in his habeas petition before the lower court, and may be in a similar position where he is seeking to speak to his Legal Team on that case but may be barred because the Team does not include an attorney or he cannot provide verification. *See* Opp'n at 12 ,12 n.1 (discussing how the case "will return [to the lower

9

court] in the event that Plaintiff succeeds in his appeal" and that "Plaintiff also intends to file a motion for rectification in the [lower court] action"). This possibility is sufficient to overcome a mootness challenge. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) ("The plain lesson of these cases is that there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness.").

Additionally, MacDougall currently allowing Mr. Alston to have privileged communications with his Legal Team does not moot this case. "The voluntary cessation of allegedly illegal conduct usually will render a case moot 'if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 375 (2d Cir. 2004) (quoting *Granite State Outdoor Adver., Inc. v. Town of Orange,* 303 F.3d 450, 451 (2d Cir.2002)). The Defendants have a "'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again," *Laidlaw*, 528 U.S. at 189, and they have not met this burden. They argue that there is no record to support that they will restrict or revoke Mr. Alston's privileged communications with his Legal Team. However, on this record, the Defendants have previously done so. *See* Opp'n at 12 ("It is uncontested that Plaintiff was permitted to speak with his Legal Team in a privileged manner, and then had his right stripped from him unceremoniously by Defendants.").

The Defendants argue that this history is not relevant because they have and will permit Mr. Alston's access if he provides verification confirming his Legal Team's Role. *See* Reply at 5 ("Plaintiff cannot point to any instance after providing verification documentation where he was

denied the ability to speak with his Legal Team in a privileged manner."). Yet, they insist on procedural requirements to access this right that are not within the text of the Administrative Directives. *See e.g.*, Mem. at 22 ("Defendants' actions requiring Plaintiff to provide verification documents and follow administrative directives regarding documents brought into the facility by Plaintiff's Legal Team until verification documents were provided, were reasonable in light of his status as an inmate."); Martin Dep. at 111: 2–5, Ex. AA, Pl. SOF  ("Q: And the requirement of partnering with an attorney is an interpretation that adds a level that is not in the directive, correct? A: Correct.); Administrative Directive 10.7(3)(H), Ex. G, MSJ Mem. ("'Privileged communication' shall also mean any telephone call or any written correspondence addressed to or received from attorneys. The word 'attorneys' shall include organizations providing legal services to inmates."); *id.* 10.7(4)(I) ("Only correspondence clearly identified as privileged correspondence shall be treated as privileged correspondence."); *id.* 10.7(5)(F) ("An inmate shall be provided a reasonable accommodation to make non-recorded telephone calls to any person enumerated in Section 3(H) of this Directive [as privileged communication] . . . ."). Thus, it is not reasonably certain that Mr. Alston will not be barred from privileged communication with his Legal Team, for example, if he does not include verification, which he argues he is not required to do so, or if the Defendants invent another procedural barrier.

Finally, even if Mr. Alston's claim for injunctive relief were moot, which they are not for the reasons explained above, his case is still viable because he seeks declaratory judgment and damages. *See* Second Am. Comp. at 9; *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 77 (2013) ("Unlike claims for injunctive relief challenging ongoing conduct, a claim for damages cannot evade review; it remains live until it is settled, judicially resolved, or barred by a statute of limitations."); *Stokes v. Vill. of Wurtsboro*, 818 F.2d 4, 6 (2d Cir. 1987) ("Claims for damages

or other monetary relief automatically avoid mootness, so long as the claim remains viable."

(quoting 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533.3 at 262

(1984 ed.))); *Ellis v. Blum*, 643 F.2d 68, 83 (2d Cir. 1981) ("This claim for damages . . . saves

the action from the bar of mootness, provided it 'is not so insubstantial or so clearly foreclosed

by prior decisions that this case may not proceed.'" (quoting *Memphis Light, Gas & Water Div.

v. Craft*, 436 U.S. 1, 9 (1978)); *Campbell v. Greisberger*, 80 F.3d 703, 706 (2d Cir. 1996) ("In

certain circumstances it may be possible for a claim for declaratory relief to survive,

notwithstanding the mootness of a companion claim for an injunction."); *Davis v. Vill. Park II

Realty Co.*, 578 F.2d 461, 463 (2d Cir. 1978) ("The availability of either nominal or substantial

damages is sufficient to prevent this case from becoming moot.").

Accordingly, the case is not moot, and the Court has subject matter jurisdiction over the

claim.

### B.  The Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires a person who is incarcerated to

exhaust administrative remedies before filing a federal lawsuit regarding prison conditions. 42

U.S.C.A. § 1997e(a) ("No action shall be brought with respect to prison conditions under section

1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other

correctional facility until such administrative remedies as are available are exhausted."); *see also

Ross v. Blake*, 578 U.S. 632, 635 (2016) ("Under the PLRA, a prisoner need exhaust only

'available' administrative remedies."); *Baez v. Kahanowicz*, 278 F. App'x 27, 29 (2d Cir. 2008)

(summary order) ("Exhaustion of administrative remedies must be completed before filing

suit.").

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life[.]" *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.").

The PLRA also requires "proper exhaustion," meaning that a person who is incarcerated must use all steps required by the administrative review process applicable to the institution in which he is confined and do so properly. *Jones*, 549 U.S. at 217–18 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador*, 655 F.3d at 96 ("Section 1997e(a) requires 'proper exhaustion'—that is, 'using all steps that the agency holds out, and doing so properly.'" (quoting *Woodford*, 548 U.S. at 90)). In other words, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirements." *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

The failure to exhaust administrative remedies is only excusable if the remedies are unavailable. *See Ross*, 578 U.S. at 642 ("Under § 1997e(a), the exhaustion requirement hinges on the availability of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." (internal citation and quotation marks omitted)).

The Supreme Court has identified three circumstances in which a remedy is unavailable. "First, as *Booth* made clear, an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643. "Next, an

administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* "And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. While the Second Circuit has noted these "three circumstances . . . do not appear to be exhaustive," *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), "these illustrations nonetheless guide the Court's inquiry," *Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Failure to exhaust is an affirmative defense under the PLRA, *see Jones*, 549 U.S. at 216, and a defendant bears the burden to prove that a person who is incarcerated did not exhaust his or her remedies prior to filing the action in court. *See Johnson v. Mata*, 460 F. App'x 11, 15 (2d Cir. 2012) (summary order) ("The defendants have the burden of showing that there is no genuine issue of material fact as to exhaustion that would preclude summary judgment."). Once a defendant establishes that administrative remedies were not exhausted before the plaintiff commenced the action, the plaintiff must establish that administrative remedy procedures were not available to him under *Ross*, or present evidence showing that he did exhaust his administrative remedies. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) ("[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion, unavailability, estoppel, or special circumstances." (internal citation and quotation marks omitted)).

The Defendants argue that Mr. Alston failed to exhaust his administrative remedies because he was required to file a grievance at each facility after he was transferred and he only filed grievances while incarcerated at Corrigan, and not at Osborn or MacDougall. MSJ Mem. at

14

10–11. Specifically, his January 19, 2023 Level-1 grievance concerning private communication with Dr. Valentin was untimely, as it was filed four months after receiving a response to his informal request whereas he had 30 days to file. *Id.* at 12. And after his second Level-1 grievance concerning Dr. Valentin was upheld, Mr. Alston never filed any more grievances at any facility that would put the Defendants on notice of issues after this decision. *Id.* Similarly, Mr. Alston filed two Level-1 grievances at Corrigan concerning communication with his private investigator and firearms expert, which were denied until Mr. Alston could provide verification that they were legal counsel, and he never filed grievances at Osborn or MacDougall. *Id.* at 13.

In reply, Mr. Alston argues he has exhausted his administrative remedies. First, when all of his grievances concerned the same underlying conduct—the inability to communicate with his legal team in a privileged manner—in his view, he is only required to properly exhaust one grievance. Opp'n at 15–16. And he did fully exhaust at least one grievance, begun in August 2022, where he argues that he requested access to expert witnesses and other legal support services. *Id.* at 16. Alternatively, he did exhaust his grievance concerning his private investigator and firearms expert, which is sufficient to exhaust his claims as to Dr. Valentin as well since it concerns the same underlying issue. *Id.* at 17.

Second, he argues that he is not required to exhaust the grievance process at each prison once he was transferred. *Id.* at 18. Administrative Directive 9.6 does not state this as a requirement. *Id.* at 18–19. Instead, AD 9.6 does state that if an incarcerated person is transferred, their pending grievance is also transferred to the new facility, suggesting, in his view, that an incarcerated person is not required to file a new grievance if transferred. *Id.* at 19.

Finally, Mr. Alston argues that, in the alternative, the Defendants should be estopped from asserting an exhaustion defense as to the claims concerning Dr. Valentin because Mr.

Alston reasonably believed it would be futile to file a grievance specific to Dr. Valentin. *Id.* at 19–20. He had already filed an unsuccessful grievance, Mr. Martin told him he would not approve Dr. Valentin as a legal contact, and he was limited to filing only one grievance a month from June 2022 to January 2023. *Id.* at 20.

The Court disagrees, for the most part.

Administrative Directive 9.6 outlines the mandatory procedures a person who is incarcerated must follow to pursue an administrative remedy concerning conditions of confinement. Pl. SOF ¶ 26. First, an incarcerated person must attempt informal resolution either verbally or in writing. *Id.* ¶ 27. If in writing, they must then submit a written request via a CN 9601 form and prison staff have fifteen business days to respond. *Id.* If informal resolution is not successful, then an incarcerated person must file a Level-1 grievance within thirty days of the initial issue and must attach proof they completed informal resolution by attaching the CN 9601 form. *Id.* ¶ 28–31. Prison administrators have thirty business days to respond to a Level-1 grievance. Administrative Directive 9.6(6)(b), Ex. D1, MSJ Mem. An incarcerated person can appeal a decision on a Level-1 grievance by filing a Level-2 grievance within five calendar days. *Id.* Prison administrators have 30 business days to respond. *Id.* Decisions on Level-2 reviews are final unless they seek appeals of Level-2 decisions that challenge department-level policy, challenge the integrity of the administrative review process, or was untimely. *Id.*

When there is a "continuing" and "identical" violation, a defendant need only properly exhaust one grievance, even if filed years before the suit. *Johnson v. Killian*, 680 F.3d 234, 239 (2d. Cir. 2012) ("[W]e now hold that Johnson's 2005 grievance was sufficient to exhaust his administrative remedies with respect to the continuing limitations on congregational prayer at FCI Otisville."). But this is a narrow exception to the PLRA's exhaustion requirements, and

"generalized complaints regarding the conditions of an inmate's confinement will [not] suffice." *Id.*; *see also id.* ("[O]ur holding is necessarily limited to cases in which a prior grievance identifies a specific and continuing complaint that ultimately becomes the basis for a lawsuit."). The key is that the grievance must "provide[] the prison administration with notice of, and an opportunity to resolve, the same problem that would continue intermittently." *Id.* at 238.

While Mr. Alston relies on this "continuing violation" theory to argue that he is not required to exhaust grievances at each facility because the issue was continuing, his grievance nonetheless must give the Defendants notice as to all his claims.[2] *See e.g.*, *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) ("In order to exhaust, therefore, inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures."). Thus, the Court examines whether any of his properly exhausted grievances provided adequate notice to satisfy the exhaustion requirement.

---

[2] The Court declines to decide whether Mr. Alston was required to exhaust administrative remedy at each facility in which he was housed and whether a properly exhausted grievance at one facility is sufficient to exhaust a claim arising from a continuing violation. *See Dean v. Sheehan*, No. 9:22-CV-00746 (BKS/ML), 2025 WL 1811183, at *14 n.14 (N.D.N.Y. July 1, 2025) ("There appears to be little, if any, guidance in the Second Circuit concerning whether a prior grievance that identifies a specific and continuing complaint, could serve to exhaust administrative remedies as to claims arising at a *different* correctional facility."). The Court, nonetheless, notes that "the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). Here, Administrative Directive 9.6 is silent as to whether an incarcerated person must exhaust administrative remedies at each facility upon transfer for the same claim, and where it does mention transfer, the Administrative Directive suggests that a grievance transfers with an incarcerated person. *See* Administrative Directive 9.6(5)(r)(i), Ex. D1, MSJ Mem. ("If an inmate transfers during any inmate administrative remedy response period, the finalized documentation shall be sent to the inmate's current facility and previous facility's administrative remedy coordinators for documentation purposes."). Where an administrative procedure is silent about a procedural requirement, a court should not impose that requirement. *See Jones*, 549 U.S. at 218 ("As MDOC's procedures make no mention of naming particular officials, the Sixth Circuit's rule imposing such a prerequisite to proper exhaustion is unwarranted."); *Espinal v. Goord*, 558 F.3d 119, 127 (2d Cir. 2009) ("The *pro se* prisoner cannot be expected to infer the existence of an identification requirement in the absence of a procedural rule stating that the grievance must include the names of the responsible parties. Where New York's grievance procedures do not require prisoners to identify the individuals responsible for alleged misconduct, neither does the PLRA for exhaustion purposes.").

Mr. Alston argues that he properly exhausted two grievances. First, in August 2022, he filed a Level-1 grievance concerning his informal request about his legal case. The informal request stated:

> Pursuant to a settlement agreement on 9-24-19 I was transferred out of state to Virigina DOC. Pursuant to a court order on 6-9-22 I was brought back to Connecticut. [B]y further court order of 6-14-22 I am to remain in Connecticut during the pendency of my habeas case to permit access to the Court's Clerk, my forensic expert witness, Private Investigator, etc., including the Connecticut DOC Law resource center or Law Library books. (See MacDougall CI inmate handbook). My placement at Corrigan CC do not permit access to

Ex. G, Pl. SOF.

On August 22, 2022, prison staff responded that "[n]o law library exists. Due to profiles, you are appropriately placed." *Id.*

On August 23, 2022, Mr. Alston challenged that decision and filed a Level-1 grievance. The grievance stated that:

> I wrote to the warden well over 15 business days ago regarding this issue. The warden never returned a written reply to my request. On August 23, 2022 the warden verbally denied my written request stating that I must write to the Connecticut Offender Classification and Population Management Unit which I had already did on August 9, 2022. The OCPM unit haven't not responded to my request either.

Ex. H, Pl. SOF.

On September 22, 2022, the grievance was denied because Mr. Alston "fail[ed] to provide this court order to prove your allegations." *Id.*

On September 23, 2022, Mr. Alston appealed this decision and filed a Level-2 grievance, stating:

> I'm appealing the level 1 decision because #1 Although I do not have a copy of the court's order granting my request to be brought back to Connecticut due to the hardship of prosecuting my state habeas case from the state of Virigina, members of the CTDOC from the interstate management unit, i.e. CCS OSDEN will not dispute

> the fact that I was returned to Connecticut so I could better have access to the tools that I need to meaningfully represent myself; #2 As the CTDOC know per contract with the BANSLEY LAW FIRM I.L.A.P. is contractual prohibited from assisting prisoners, including this inmate with criminal matter or matters arising from a criminal case. Without access to the law books or other legal research materials at the MacDougall or Chesire Facilities I have no way of researching legal claims raised in my habeas case or the legal claims raised in opposition.

Ex. I, Pl. SoF.

On October 18, 2022, the appeal was denied. The response stated:

> You are appealing a level on grievance (I40-23-065) regarding access to a law library. The response provided by Warden Martin in appropriate. In accordance with A.D. 10.3 Legal Assistance to Prisoners, the Department of Correction provides for an inmate's access to courts and for legal assistance through a contracted legal firm. . . . .

*Id.*

There is no doubt that this grievance is properly exhausted having filed timely Level-1 and Level-2 grievances, but, this grievance is not sufficient to provide notice to the Defendants about his claims. "While this Court has found it appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally." *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006). Here, Mr. Alston's grievance appears to be requesting access to the law library, *see, e.g.*, Ex. I ("Without access to the law books or other legal research materials at the MacDougall or Chesire Facilities I have no way of researching legal claims raised in my habeas case or the legal claims raised in opposition."), and the prison administrators interpreted his grievance this way, *see e.g.*, Ex. G ("No law libraries exist."). The grievance also mentions his access to other legal resources, such as the "Court's Clerk, my forensic expert witness,

Private Investigator, etc.," *id.*,[3] but this is too vague to put the Defendants on notice of his specific claims that he was barred from privileged and confidential communication with his Legal Team at that facility, Corrigan, let alone at Osborn or MacDougall once he was transferred. *See Johnson*, 380 F.3d at 697 ("In order to exhaust, therefore, inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures."); *Espinal v. Goord*, 558 F.3d 119, 126–27 (2d Cir. 2009) ("[A]s long as the prisoner provides enough information about the alleged misconduct, . . . the State will normally be able to identify any direct party to a grievance on its own through investigation."); *Brownell*, 446 F.3d at 311 ("As there were no allegations of misconduct by corrections officers, that grievance was simply a claim for property lost in transit from Woodbourne to Shawangunk, a claim that does not trigger the level of investigation that a grievance suggesting retaliation would trigger."). Thus, Mr. Alston's August 2022 grievance did not properly exhaust his claims.

The Court next considers the other grievance Mr. Alston argues satisfies the exhaustion requirement. On October 18, 2022, Mr. Alston filed a written informal request, which stated:

> G&G Firearms Experts and Fortified Investigations and Security, LLC are a part of my Legal Team in my Habeas Corpus case. I am requesting for all written and oral communications to and from G&G Firearms Experts and Forfeited Investigations and Security, be treated as privilege legal and private communication. *See* A.D. 10.7 § 3.H. Please send me a written reply to this request.

Ex. N, Pl. SOF.

---

[3] Mr. Martin, in his deposition, also conceded that the grievance put him on notice that Mr. Alston was attempting to access his Legal Team. *See* Opp'n at 17 n.3 ("You would at least agree that to the extent that this is one full document, that Mr. Alston is at least alerting you … that he's preparing for his habeas and he's looking for access to … his experts and witnesses?" / "…As far as the grievance, yes."). However, as explained above, access to his Legal Team is insufficient notice about his claim that he was barred from privileged communication with his Legal Team.

On November 2, 2022, Mr. Martin denied the request because "the private compan[ies] [are] not considered legal correspondence." Ex. O, Pl. SOF.

On November 4, 2022, Mr. Alston filed a Level-1 grievance challenging the decision:

> On 10-18-2022, the grievant, Ira Alston, submitted a CN9601, Inmate Request Form to Warden Martin requesting that all written and oral communications between the grievant and G&G firearms experts and fortified investigations and security, LLC be treated as "privilege communications" under A.D. 10.7, Inmate Communications § 3.H. . . . This request was denied by Warden Martin on November 2, 2022, stating; "Your request is denied, the private company is not considered legal correspondence." . . . G&G firearms experts and fortified investigations and security, LLC is assisting this grievant with the development of his claims in a pending legal matter. Therefore, all communications to and from these legal organizations should be treated as "privilege communications" under A.D. 10.7 § 3.H. It should not be ignored that this grievant h[as] a first amendment right to private communications between him and his legal paraprofessionals. Based on these facts and law, the grievant request[s] that he be private communications with aforesaid organizations.

Ex. P, Pl. SoF.

On December 6, 2022, Mr. Martin denied the request because "private investigators are not considered privileged communication per A.D. 10.7 section 3H. If documentation and/or verification is received regarding the investigative firm partnering with an attorney(s) on a specific case(s), your request for communication to be deemed privileged may be granted upon review." *Id.*

On December 7, 2022, Mr. Alston filed a Level-2 grievance appealing the decision. *Id.* Mr. Guadarrama denied the appeal on December 21, 2022. *Id.*

Mr. Alston, however, did not exhaust this grievance before he filed his initial Complaint. *See Fabrizio v. Annucci*, No. 918CV0339GTSDEP, 2019 WL 3351643, at *8 (N.D.N.Y. June 27, 2019) ("Where a plaintiff files an amended complaint, the operative date for an exhaustion analysis is the date of plaintiff's original complaint."). *Compare* Compl. (filed on November 22,

2022), *with* Ex. P (decision on Level-2 appeal on December 21, 2022). Filing the operative Complaint in May 2024 does not satisfy the exhaustion requirement. *See Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001) ("Subsequent exhaustion after suit is filed therefore is insufficient."); *Burgos v. Craig*, 307 F. App'x 469, 470 (summary order) (2d Cir. 2008) ("[Exhaustion] must be completed before suit is filed, and completing the exhaustion requirements only after filing suit is insufficient."); *McLaurin v. Otero*, No. 3:21CV00717(SALM), 2022 WL 3027917, at *8 (D. Conn. Aug. 1, 2022) ("Courts within this Circuit have consistently held that 'post-exhaustion amendment of pleadings filed originally before exhaustion to reflect that exhaustion has become complete cannot cure the original nonexhaustion defect.'" (quoting *Kasiem v. Switz*, 756 F. Supp. 2d 570, 575 (S.D.N.Y. 2010))); *Guillory v. Haywood*, No. 9:13-CV-01564 MAD, 2015 WL 268933, at *11 (N.D.N.Y. Jan. 21, 2015) ("Furthermore, a post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced.").

Assuming *arguendo* that Mr. Alston's operative Complaint could cure the exhaustion defect, *see McLaurin*, 2022 WL 3027917, at *9 ("The Court acknowledges that there appears to be a split of authority nationwide regarding whether the filing of an amended complaint can cure an exhaustion defect that existed at the time the original complaint was filed. However, *Neal* remains the law of this Circuit, and this Court is bound to follow it."); *id.* n.6 (comparing cases from the Ninth and Third Circuit allowing an amended complaint to cure exhaustion defects with cases from the Seventh and Eleventh Circuit rejecting this argument); *Sanchez v. Nassau Cnty.*, 662 F. Supp. 3d 369, 399 (E.D.N.Y. 2023) ("[A] supplemental complaint can cure defects from a prior complaint."), this grievance still does not fully exhaust his claims.

22

As to Mr. Alston's claims regarding issues at Osborn and MacDougall, this grievance is related to a "specific and continuing complaint" similar to the one at issue in *Johnson.* 680 F.3d at 239. There, the plaintiff, who was Muslim and whose religious beliefs required him to pray five times a day, challenged a prison policy that restricted access to the chapel to once a day and provided no other space to pray. *Id.* at 236. He exhausted administrative remedies in 2005, but the prison soon stopped enforcing the policy. *Id.* 236–37. In 2007, a new warden of the prison reimplemented the policy. *Id.* at 237. The plaintiff filed a lawsuit without again going through the administrative grievance process. *Id.* The Second Circuit held that the "2005 grievance was sufficient to exhaust his administrative remedies with respect to the continuing limitations on congregational prayer." *Id.* at 239.

Viewing the evidence in light most favorable to Mr. Alston, this grievance raises an "identical" issue as his Complaint. *See id.* (concluding that "the issue that [the plaintiff] would have raised in 2007—the inadequacy of the spaces and times allotted for congregational prayer—was *identical* to the issue he exhausted in 2005"). *Compare* Ex. P, MSJ Mem. ("G&G firearms experts and fortified investigations and security, LLC is assisting this grievant with the development of his claims in a pending legal matter. Therefore, all communications to and from these legal organizations should be treated as "privilege communications" under A.D. 10.7 § 3.H."); *with* Second Am. Compl. ¶ 37 ("On or about November 25, 2023 [while at Osborn], Plaintiff filed an Inmate Request Form requesting that all communications, written and telephonic, between Plaintiff and the Legal Team be treated "private/privilege communication" pursuant to Connecticut Administrative Directive 10.7."); *and id.* ¶ 52 ("Defendant Guadarrama, by [MacDougall] facility rule, has made clear that 'calls to the following are not Legal calls . . . Private Investigators.'").

Additionally, this grievance is specific enough in that it challenges the application of Administrative Directive 10.7 to his firearms expert and private investigator, a violation that does not change even if he was transferred to a different prison. *See Rose v. Annucci*, No. 916CV787BKSATB, 2018 WL 2729259, at *6 (N.D.N.Y. Apr. 19, 2018) ("Although hypothetical enforcement concerns may have been part of plaintiff's motivation at the time that he filed his 2014 and 2015 grievances, he has not demonstrated that the issues raised are identical with the claims that arose in 2016."); *Dean v. Sheehan*, No. 9:22-CV-00746 (BKS/ML), 2025 WL 1811183, at *14 (N.D.N.Y. July 1, 2025) ("The alleged April 27 grievance about 'being denied to make legal copies and send legal mail' suggests, at best, a generalized complaint about legal copies and legal mail at Collins . . . [and] was not sufficient to place DOCCS officials at Marcy on notice that Plaintiff was being wrongfully denied legal copies and advance postage for legal mail.").

Furthermore, Mr. Martin and Mr. Guadarrama were personally involved in both grievance decisions, and, as wardens, for implementing Administrative Directive 10.7. Pl. SOF ¶ 3, 4 (detailing that Mr. Martin was warden at Osborn and Mr. Guadarrama of MacDougall); *id.* ¶ 7 (disputing whether the "Defendants were not involved in the administration and decision-making regarding issues in this case"). Thus, there may a colorable argument that Mr. Alston exhausted his claims specifically regarding privileged communication with Fortified Investigations and Security, LLC, and G & G Firearm Experts, Inc. *But see Dean*, 2025 WL 1811183, at *14 n.14 ("There appears to be little, if any, guidance in the Second Circuit concerning whether a prior grievance that identifies a specific and continuing complaint, could serve to exhaust administrative remedies as to claims arising at a *different* correctional facility.").

Nonetheless, the grievance fails to give notice that Mr. Alston was prevented from having privileged communication with Dr. Valentin, as it makes no mention of him or broader issues with access to his entire Legal Team. *See* Ex. N, MSJ Mem. ("I am requesting for all written and oral communications to and from G&G Firearms Experts and Fortified Investigation and Security, LLC be treated as privilege legal and private communication."); Ex. P, MSJ Mem. ("G&G firearms experts and fortified investigations and security, LLC is assisting this grievant with the development of his claims in a pending legal matter. Therefore, all communications to and from these legal organizations should be treated as 'privilege communications' under A.D. 10.7 § 3.H.").

While Mr. Alston is not required to name specific individuals when DOC regulations do not impose this requirement, *see Jones*, 549 U.S. at 219 ("[E]xhaustion is not per se inadequate simply because an individual later sued was not named in the grievances."); *Espinal*, 558 F.3d at 127 ("Where New York's grievance procedures do not require prisoners to identify the individuals responsible for alleged misconduct, neither does the PLRA for exhaustion purposes."); Administrative Directive 9.6(6)(a)(4)(a), Ex. D1, MSJ Mem. (requiring a grievance only to "clearly state the problem and action requested to remedy"), the issue here is not the failure to specifically name Dr. Valentin, but that the grievance offers no indication that Mr. Alston had issues communicating with Dr. Valentin.

In fact, around the same time as filing this Level-1 grievance, Mr. Alston filed a separate informal grievance concerning Dr. Valentin. *See* Ex. L, Pl. SOF (dated November 8, 2022). Yet, he failed to file a Level-1 grievance on this issue.

Mr. Alston argues that he was unable to because he was on a grievance restriction until January 2023 and limited to one grievance per month. A defendant can be estopped from

25

asserting an exhaustion defense when their "own actions prevent a prisoner from pursuing administrative remedies." *Ruggiero*, 467 F.3d at 178. But estoppel is not applicable here because Mr. Alston has failed to show that the grievance restriction prevented him from filing a grievance. *See Conquistador v. Hannah*, No. 3:19-CV-1293 (KAD), 2022 WL 17821143, at *5 (D. Conn. Dec. 20, 2022) ("Conquistador would be permitted to proceed on his claims in federal court if the grievance restrictions truly prevented him from exhausting his administrative remedies.").

Here, the earliest alleged conduct took place on August 22, 2022, when prison staff searched through, opened, and discarded mail from Dr. Valentin, and then on September 7, 2022, Mr. Alston was again denied mail during a visit with Dr. Valentin. AMF ¶ 9,18. Under Administrative Directive 9.6, Mr. Alston had 30 calendar days to file a Level-1 grievance. Administrative Directive 9.6(6)(a)(ii)(4), Ex. D1, MSJ Mem. Therefore, he had until September 21, 2022 to file a Level-1 grievance about the initial mail incident, or until October 7, 2022 for the visit incident.

Mr. Alston, however, decided to file a grievance in September and October on "unrelated" issues. Opp'n at 20. The decision to file a grievance about another issue, notwithstanding the grievance restriction, does not mean the process was unavailable to him. *See Seiler v. Semple*, No. 3:17-CV-71(AWT), 2018 WL 3935033, at *4 (D. Conn. Aug. 16, 2018) ("The plaintiff could have elected to use his August grievance to address this issue, or he could have filed a grievance on September 1, 2016, the last day of the thirty day period to file a grievance on this issue. He did not do so. The court concludes that the grievance procedures were available to the plaintiff but he did not utilize them."); *Pena v. Cook*, No. 3:19-CV-825 (KAD), 2020 WL 6275034, at *5 (D. Conn. Oct. 26, 2020) ("This means that Pena had until April 28,

2019 to file a grievance regarding his transfer to Corrigan. Such a grievance could have been submitted in March (on the 29th, 30th or 31st) or in April. Pena also had until May 28, 2019 to file a grievance stemming from the assault. Such a grievance could have been submitted in April (on the 29th or 30th) or in May. Accordingly, as he was permitted one grievance per month, the restriction did not impact his ability to file grievances as to both events."); *cf. Conquistador*, 2022 WL 17821143, at *5 ("Conquistador was first placed on grievance restriction on March 29, 2019, after the time for filing the Level 1 grievance had passed. Thus, the grievance restrictions did not prevent Conquistador from properly exhausting his administrative remedies on his conditions of confinement claim.").

Similarly, the Defendants are not estopped from asserting the exhaustion defense because Mr. Alston believed it would be "futile." Opp'n at 20. Previous denial of his grievance, especially when his only grievance to that point concerned access to the law library, is insufficient to suggest that the process was futile. *See Killian*, 2009 WL 1066248, at *5 ("Plaintiffs also argue that filing a new administrative grievance concerning the 2007 prayer restrictions would have been futile, because prison authorities had already denied the 2005 grievance. However, such a prediction of denial, even if wholly reasonable, does not warrant depriving the prison administration of the opportunity to address the claim in the first instance, a paramount goal of the PLRA."); *Beatty v. Goord*, 210 F. Supp. 2d 250, 254 (S.D.N.Y. 2000) ("[E]ven if no relief is granted, 'a prisoner's resort to the administrative process is not futile, but allows grievances to be heard and a record to be created for review in any subsequent proceeding.'" (quoting *Alexander v. Hawk*, 159 F.3d 1321 (11th Cir. 1998))).

His claim of futility is also undermined by the fact that Mr. Alston still proceeded with administrative remedies by filing an informal written request after Mr. Martin told him that he

would not approve the request. *See* AMF ¶ 11, 19; *see also Amador*, 655 F.3d at 103 (discussing how prior cases have found the estoppel applicable when the defendant engaged in "verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers").

In total, Mr. Alston fails to satisfy the exhaustion requirement for several reasons. First, his initial grievance concerning access to the law library does not provide sufficient notice as to his claims concerning privileged access to his Legal Team. Second, his grievance concerning his private investigator and forensic expert was not exhausted before he filed his initial Complaint. And even if the Second Amended Complaint can cure the exhaustion defect, which *Neal* forecloses, the grievance only partially exhausts his claims. While it may exhaust his claims as to Fortified Investigations and Security, LLC, and G & G Firearm Experts, Inc., even at Osborn and MacDougall, it is insufficient to exhaust his claims as to Valentin Forensics, LLC.

Accordingly, the Defendants are entitled to summary judgment because Mr. Alston failed to exhaust his administrative remedies.

### C.  The First Amendment Claims

Although Mr. Alston failed to exhaust his administrative remedies, as discussed above, and judgment should enter for the Defendants on that basis, the Court nonetheless will review his substantive claims to determine if they would survive in any event.

A person who is incarcerated "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir. 1995); *Pell v. Procunier*, 417 U.S. 817, 822 (1974). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."

*Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004) ("The governing standard is one of reasonableness." (citation modified)); *Burns v. Martuscello*, 890 F.3d 77, 86 (2d Cir. 2018) ("At bottom, '[t]he governing standard is one of reasonableness.'" (quoting *Shakur*, 391 F.3d at 113)).

"The reasonableness of a prison regulation is measured by the three-step analysis outlined by the Supreme Court in *Turner*." *Shakur*, 391 F.3d at 113. "First, we ask 'whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective.'" *Id.* (quoting *Thornburgh v. Abbott,* 490 U.S. 401, 414 (1989)). "Second, we look to see 'whether there are alternative means of exercising the right that remain open to prison inmates.'" *Id.* (quoting *Thornburgh,* 490 U.S. at 417). "Third, we examine 'the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison.'" *Id.* (quoting *Thornburgh,* 490 U.S. at 418).

The Defendants argue that, as a matter of law, there was no First Amendment violation. Mr. Alston's communication with his legal team was not protected under attorney-client privilege because they were retained for expert services and not to provide legal advice, nor was he represented by legal counsel. MSJ Mem. at 16, 18. Similarly, this communication was not protected under the work product doctrine because it does not extend to oral communication and Mr. Alston has not identified specific documents that could be privileged. *Id.* at 22–23. Finally, there was no First Amendment violation because the prison had a legitimate penological interest to limit his communications and it was reasonable to require Mr. Alston to provide verification before authorizing privileged communication with his legal team. *Id.* at 22.

In reply, Mr. Alston argues that the First Amendment protects legal communications, even in prison. Opp'n at 21. In his view, this protection is embodied in the First Amendment itself, and not in attorney-client privilege or work product doctrine. *Id.* at 21–22. As a result, he argues that his communication is legal even if Mr. Alston is *pro se* and communicating with experts who are not attorneys, which aligns with DOC regulations that include in the definition of attorney "organizations providing legal services." *Id.* at 22. Nonetheless, in his view, his written communications would qualify as work product as they were prepared in anticipation of litigation for him. *Id.* And, again in his view, he is not required to identify specific documents as that only applies when a party seeks to withhold documents during discovery. *Id.* at 23.

The Court disagrees, for the most part.[4]

While an incarcerated person's First Amendment rights to legal communication may be afforded "greater protection," *see Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003), these rights are not absolute, *see Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir. 1995) ("A prison inmate, therefore, retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). A prison regulation may restrict First Amendment rights as long as the regulation is "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89; *see also Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986) ("Censorship of an inmate's mail is justified only if it furthers 'one or more of the substantial governmental interests of security, order, and rehabilitation.'" (quoting *Procunier v. Martinez,* 416 U.S. 396, 413 (1974)); *Rodriguez v. James,* 823 F.2d 8, 12 (2d Cir.

---

[4] The Court agrees with Mr. Alston that his right to privileged communication with his Legal Team, to the extent such right exist and survives in the prison context, would be rooted in the First Amendment itself, and not in attorney-client privilege or the work product doctrine. As Mr. Alston has not "asserted that he has attorney-client privilege with his Legal Team," Opp'n at 21, the Court focuses its analysis on any alleged protection under the First Amendment.

1987) ("The appropriate standard for deciding whether a particular regulation or practice relating to inmate correspondence impermissibly restrains first amendment rights was recently articulated by the Supreme Court in *Turner*.").

The restriction at issue here is not whether the Defendants can wholly ban Mr. Alston from private communication with his Legal Team, but whether they can require Mr. Alston to first provide verification before granting access. *See e.g.*, Pl. SOF ¶ 14 ("Plaintiff admits that the request was 'denied until further documentation and/or verification was received[.]'"). Mr. Alston "bears the burden of proving that the disputed regulation is unreasonable." *Giano*, 54 F.3d at 1054; *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."). And he has failed to raise a genuine issue of material fact as to whether the Defendant's actions were unreasonable under the three-part analysis in *Turner*.[5]

On the first prong, DOC has a legitimate and neutral reason for restricting Mr. Alston's asserted First Amendment rights to privileged communication with his Legal Team, and these restrictions were rationally related to that objective. *See Shakur*, 391 F.3d at 113 (describing the first step of *Turner* as "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective"). The Defendants argue that "requiring [Mr. Alston] to provide verification documents and follow administrative directives regarding documents brought into the facility by Plaintiff's Legal Team until verification documents were provided, were reasonable in light of his status as an inmate,"

---

[5] Mr. Alston's argument focuses on whether he has a First Amendment right, but he does not raise any arguments as to whether the Defendants' restrictions were unreasonable. *See* Opp'n 20–23. The Court "need not attempt to explore or define the asserted right . . . or determine the extent to which it survives incarceration because the challenged regulations bear a rational relation to legitimate penological interests. This suffices to sustain the regulation in question." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

and that "[t]hese actions were necessary to protect the staff, inmates, and public until Plaintiff could establish his Legal Team's credentials and authority." Opp'n at 22.

This safety rationale is legitimate. *See Shakur*, 391 F.3d at 113 ("Conduct expressly aimed at protecting prison security is 'legitimate' beyond question and is in fact 'central to all other correctional goals.'" (quoting *Thornburgh*, 490 U.S. at 415)); *Giano*, 54 F.3d at 1054 ("[T]he prison officials' purpose in promulgating the regulation—maintaining prison security and protecting against increased inmate violence—is obviously legitimate."). The restriction is also neutral. *Bell v. Wolfish*, 441 U.S. 520, 551 (1979) ("The rule operates in a neutral fashion, without regard to the content of the expression."). Lastly, the restriction is rationally related to legitimate safety concerns. *See e.g.*, *Turner*, 482 U.S. at 91 ("The prohibition on correspondence between institutions is logically connected to these legitimate security concerns."); *Overton*, 539 U.S. at 133 ("[T]he restrictions on visitation by children . . . bear a rational relation to [the prison's] valid interests in maintaining internal security . . . . The regulations promote internal security, perhaps the most legitimate of penological goals, by reducing the total number of visitors . . . .").

Mr. Alston has also not put forward in this record anything creating a genuine issue of material fact as to this restriction being rationally related to the Defendants' interest in safety. *See Giano*, 54 F.3d at 1054 ("[A]lthough we must draw all reasonable inferences in Giano's favor for purposes of summary judgment, Giano must still meet his burden of proving the policy irrational to avoid dismissal.").[6]

---

[6] To the extent he argues that the verification requirement is "pretextual" because the Administrative Directive does not require it, Opp'n at 6, *see also* Pl. SOF ¶ 20 ("Plaintiff denies that he was required to provide documentation or verification for his Legal Team under A.D. 10.7."), "a violation of a state law or regulation in itself does not state a federal claim for relief under 42 U.S.C. § 1983," *Mills v. Fischer*, 497 Fed. App'x 114, 116 (2d Cir. 2012) (summary order).

On the second prong, while alternative means to exercise Mr. Alston's asserted right may exist, *see. e.g.*, Opp'n at 25 ("Defendants should simply ask the Office of the Chief Public Defender to corroborate his story."), "courts should defer to the informed discretion of prison officials to gauge the validity of the regulation," *Giano*, 54 F.3d at 1056. Here, Mr. Alston has not created a genuine issue of material fact on whether he is completely barred from private communications with his Legal Team; on this record, he is not; he must provide verification first, satisfying the second prong. *See Overton*, 539 U.S. at 135 ("Alternatives to visitation need not be ideal, however; they need only be available. Here, the alternatives are of sufficient utility that they give some support to the regulations, particularly in a context where visitation is limited, not completely withdrawn.").

On the third and final prong, Mr. Alston has not created a genuine issue of material fact that his alleged alternative is reasonable, and would do no more than impose a *de minimis* cost. *See Overton*, 539 U.S. at 136 ("*Turner* does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal."); *Turner*, 482 U.S. at 93 ("As petitioners have shown, the only alternative proffered by the claimant prisoners, the monitoring of inmate correspondence, clearly would impose more than a *de minimis* cost on the pursuit of legitimate corrections goals."); Reply at 7 ("[I]t is absurd to expect Defendants to contact multi-level outside agencies for verification documents upon direction inmates in high security facilities."). Instead of relying on evidence, he resorts to mere argument.

As a result, Mr. Alston has failed to create a genuine issue of material fact on the issue of whether Defendants' rule requiring Mr. Alston to provide verification of his Legal Team before

allowing private communications is unreasonable, at least on this record. *See Mills v. Fischer*, 497 F. App'x 114, 116 (2d Cir. 2012) (summary order) ("A rule requiring the production of some form of identification beyond a birth certificate by family members seeking visitation would not be unreasonable." (citing *Overton*, 539 U.S. at 133, for the proposition that "regulations promot[ing] internal security advance perhaps the most legitimate penological goals" (internal marks omitted))); *see also id.* at 117 ("Particularly in light of the fact that New York's actual rule is plainly reasonable, we cannot say that the denial of access on a single occasion by a prison guard who mistakenly applied a more stringent identification rule that was not in itself unreasonable gives rise to a constitutional claim. Thus, plaintiffs' First Amendment claims were properly dismissed.").

Accordingly, summary judgment must be granted to the Defendants because there was no violation of Mr. Alston's First Amendment rights, to the extent such a right to privileged communication with his Legal Team even exists.

### D. The Qualified Immunity Defense

Qualified immunity, shields government "employees from civil liability under § 1983 if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that [their] acts did not violate these clearly established rights." *Cornejo v. Bell*, 592 F. 3d 121, 128 (2d Cir. 2010) (internal quotation marks omitted); *see also Luna v. Pico*, 356 F.3d 481, 490 (2d. Cir. 2004) ("The doctrine of qualified immunity protects state officials from civil liability for actions performed in the course of their duties if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

A right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). There is no requirement that a case have been decided which is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

In addition, qualified immunity protects state actors when it was objectively reasonable for the state actor to believe that his conduct did not violate a clearly established right. *Manganiello v. City of N. Y.,* 612 F.3d 149, 165 (2d Cir. 2010). "If a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1867 (2017).

The Defendants argue that they are entitled to qualified immunity because the alleged constitutional violation is not clearly established and it was objectively reasonable for the Defendants to restrict Mr. Alston's communication while in prison. MSJ Mem. at 25–27.

In reply, Mr. Alston argues that his First Amendment right to communicate with his legal team was clearly established. Opp'n at 24. DOC's own regulations establish that legal communication is privileged, and the Defendants were aware of this regulation. *Id.* And under DOC regulations, the Defendants were required to investigate his grievance to confirm that Mr. Alston sought communication with his authorized legal team. *Id.* at 25. Furthermore, there are genuine disputes of material fact concerning whether the Defendants knew about Mr. Alston's legal team and their obligation to investigate his claims, such that summary judgment should be denied on qualified immunity grounds. *Id.*

The Court disagrees.

"[O]nce we decide that there is no constitutional violation, there typically is no need to address whether defendants are also protected by qualified immunity . . . ." *Duamutef v. Hollins*, 297 F.3d 108, 113 n.1 (2d Cir. 2002). If it had to reach that issue, however, based on this record—the Second Amended Complaint—qualified immunity would have been applied, and the Defendants would have been granted judgment in their favor. The Defendants' actions— requiring Mr. Alston to provide documentation of his Legal Team before allowing private communications—were objectively reasonable under the prevailing law. Nor is there any clearly establish law suggesting otherwise.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is

**GRANTED.**

The Clerk of Court is respectfully requested to enter judgment in favor of the Defendants, and close this case.

**SO ORDERED** at New Haven, Connecticut, this 6th day of February, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE